EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ ENRIQUE PÉREZ, acusado y apelante.

No. 4712.—*Sometido:* Enero 24, 1934. *Resuelto:* Diciembre 13, 1934.

*José Tous Soto, Arturo Aponte, J. Valdejulli Rodríguez* y *Joaquina Pérez Cordero,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Mediante información, el Gran Jurado del Distrito de San Juan acusó a José Enrique Pérez del delito de abuso de confianza (*felony*) cometido como sigue:

"El referido acusado José Enrique Pérez, allá por el mes de diciembre de 1925 y en San Juan, que forma parte del Distrito Judicial de San Juan, P. R., ilegal, voluntaria y maliciosamente, y con intención de defraudar, como defraudó, a El Pueblo de Puerto Rico, corporación política debidamente creada por una ley del Congreso de los Estados Unidos, en ocasión de desempeñar el puesto de Oficial Receptor del Negociado del Telégrafo Insular, de la referida corporación política El Pueblo de Puerto Rico, se apropió de un cheque expedido por El Pueblo de Puerto Rico, a favor de Otilia Rivera, por la suma de seis dólares con veinte y un centavos ($6.21), el cual había sido confiado al acusado José Enrique Pérez, y recibido por él. en el curso de sus deberes como tal Oficial Receptor del Negociado del Telégrafo Insular de El Pueblo de Puerto Rico, usando dicho cheque en su propio beneficio, y para fines ajenos al legítimo desempeño de su cargo, defraudando de esta manera al referido El Pueblo de Puerto Rico, en la suma ya indicada de seis dólares con veinte y

un centavos ($6.21), siendo además el referido cheque allí y entonces, fondos públicos pertenecientes a y de la propiedad de El Pueblo de Puerto Rico.''

El 13 de diciembre de 1930 se leyó la acusación al acusado formulando éste las siguientes alegaciones:

Haber sido absuelto por el mismo delito y por la misma transacción en noviembre 9, 1929. Causa No. 1058.

Haber sido absuelto por el mismo delito y por la misma transacción en diciembre 15, 1928. Causa No. 869.

Haber estado expuesto por el mismo delito y por la misma transacción en la causa No. 1057 en la cual el Jurado llamado para juzgarle fué disuelto indebidamente.

Entonces dijo el fiscal: ''Nosotros negamos que el acusado haya sido absuelto anteriormente por los mismos hechos y asimismo negamos que haya sido expuesto por el mismo delito. Además, establecemos como alegación especial en cuanto a los veredictos absolutorios, que fueron obtenidos fraudulentamente.'' Se opuso la defensa a la última manifestación del fiscal. Replicó éste y la corte resolvió:

''La alegación de *former jeopardy* es tanto de derecho como de hecho. Es una cuestión a resolver por el Jurado. Que el acusado la desenvuelva en el momento del juicio y que el Jurado la resuelva. De modo que hecho este reparo y esa defensa a la acusación procede que el acusado conteste la misma.''

''Para los fines del récord,'' contestó la defensa, ''tomamos excepción. Hacemos la alegación de 'no culpable' y solicitamos juicio por jurado.''

El 14 de enero de 1931 se llamó la causa para juicio. Al procederse a la insaculación de los jurados el Secretario informó que no había suficientes porque cinco habían sido excusados, dos no habían podido ser citados y doce estaban deliberando en un caso que les había sido sometido. La corte ordenó la disolución de los paneles que habían sido citados, la citación de un panel regular de veinte y cuatro y otro especial de diez para comparecer a las dos de la tarde, y así se hizo.

A las dos de la tarde respondieron diez y siete jurados. El abogado del acusado, Sr. Tous Soto, solicitó la suspensión de la vista hasta el día siguiente por encontrarse enfermo y la corte accedió.

El 15 de enero, 1931, como a virtud de las recusaciones de ambas partes se agotaran los paneles citados, se ordenó la citación de otro especial de doce, quedando al fin, por la tarde, seleccionados los doce jurados que debían intervenir en el juicio.

Hizo el acusado una recusación general del panel, que fué desestimada, se tomó juramento a los jurados y siendo las cinco y media de la tarde, el juicio fué suspendido hasta el 16, continuando el 17, el 21, el 22, el 23, el 24, el 26, el 27, el 28 y el 29 de enero, en que terminó con el siguiente veredicto:

"Nosotros los señores del Jurado declaramos al acusado José Enrique Pérez culpable del delito de Abuso de Confianza (*felony*). (Fdo.) Eugenio Astol, presidente del Jurado."

En febrero 12, 1931, pidió el acusado un nuevo juicio, que le fué negado por orden de 7 de diciembre siguiente, y el 14 del propio mes pronunció la corte su sentencia condenándolo a sufrir la pena de cuatro años de presidio con trabajos forzados. Contra ella interpuso el acusado el presente recurso de apelación.

Señálanse en el alegato la comisión de veinte y un errores que se discuten ampliamente en el mismo. Algunos de ellos vuelven a discutirse en un alegato adicional archivado el 8 de enero de 1934, que fué contestado por el Fiscal el 24 del propio mes.

▇ Los dos primeros errores señalados versan sobre la constitución del jurado. No se les da gran importancia en el alegato y en efecto no la tienen.

Con motivo de la creación de la Corte de Distrito de Bayamón, la lista de jurados de la Corte de Distrito de San Juan fué alterada. Se nombró un nuevo comisionado, se

eliminaron los jurados procedentes de los pueblos que forman el nuevo distrito y se designaron otros jurados del propio distrito de San Juan para sustituirlos.

La actuación de la corte en tal sentido fué correcta. A lo que tiene derecho un acusado es a ser juzgado por un jurado de su distrito, seleccionado en la forma que la ley determina. Los distritos son susceptibles de ser alterados por la Legislatura, siendo el distrito de un acusado el que fija la ley. Al promulgarse el estatuto creando la Corte de Distrito de Bayamón con municipios que antes correspondían a la de Distrito de San Juan, dichos municipios dejaron de formar parte del Distrito de San Juan y el acusado, por tanto, no tenía derecho a que lo juzgaran jurados de esos municipios. Su distrito era el de San Juan, formado por los municipios que la Legislatura asignó definitivamente al mismo después de la segregación. *El Pueblo* v. *Capre*, 44 D.P.R. 112, 116.

En cuanto a la selección de los doce jurados que intervinieron en la causa y rindieron el veredicto, pudo sin duda la corte aprovechar los jurados que ya habían sido citados para otros casos. No lo hizo así. Ordenó la citación de un nuevo panel regular y de dos especiales necesarios a virtud del gran número de recusaciones. Bajo las circunstancias concurrentes no creemos que la corte se separara de tal manera del procedimiento marcado en la ley ni ejercitara su discreción en tal forma que pueda concluirse que violó algún derecho fundamental del acusado. No se demostró perjuicio.

En el caso de *El Pueblo* v. *Juliá*, 25 D.P.R. 258, 260, dijo esta corte:

"Los casos de El Pueblo v. Acosta, 11 D.P.R. 249, El Pueblo v. Morales (*a*) Yare Yare, 14 D.P.R. 234, El Pueblo v. Vázquez, 20 D.P.R. 361, El Pueblo v. Pillot, 20 D.P.R. 376, demuestran que la corte tiene una amplia discreción en esta cuestión de sortear un jurado y no vemos que haya habido abuso o perjuicio para el apelante. La forma de hacer la elección fué a lo sumo una mera irregularidad

como se indica en los casos citados. Iguales pronunciamientos se hacen en los casos de State v. Medley, 66 S. E. 358, State v. Watson, 10 S. E. 705, People v. Sowell, 145 Cal. 292, State v. Straub, 47 Pac. 227, People v. Richards, 82 Pac. 691, State v. Croney, 71 Pac. 783, para demostrar que un número mayor de jurados no puede perjudicar al acusado, que los estatutos semejantes son meramente directorios y que la corte no revocará la sentencia, a no ser que se demuestre que ha habido algún perjuicio.''

 Se sostiene por èl tercer señalamiento que la corte erró al admitir la declaración de Enrique Palacios para demostrar los cargos públicos del acusado y al admitir el nombramiento de éste de *Disbursing Officer*, sin acreditarse la aprobación del mismo por el Gobernador.

La evidencia objetada consistió en la declaración de Enrique Palacios, Superintendente Auxiliar del Negociado del Telégrafo Insular, que dijo:

''. . . que conoce a José E. Pérez, el acusado, quien fué empleado de dicho Negociado durante los años 1920 al 1927; que en el 1925 era empleado de dicho negociado; que el nombramiento de Pérez era de 'oficinista y contable' de dicho negociado; que no vió el nombramiento de Pérez, que cree vió copia en un 'file', que Pérez era el *Receiving Officer;* que toda la correspondencia, incluyendo las remesas de fondos de los telegrafistas de la isla, venían dirigidas al Superintendente de Telégrafos, que éste lo es y lo era en 1925 Manuel Rodríguez, que el testigo abría la correspondencia y ordenaba la distribución de la misma a los diferentes empleados, que no veía hacer la distribución, que ésta la hacían los mensajeros; que las remesas de la Isla ordenaba que se entregaran al acusado Pérez. Manifestó además el testigo Enrique Palacios que el acusado José Enrique Pérez, en su carácter de *Receiving Officer*, oficinista y Contable y de *Special Disbursing Officer*, del Negociado del Telégrafo Insular de El Pueblo de Puerto Rico, y cuyo cargo venía desempeñando el acusado desde el año 1920, hasta el 1927, desempeñándolo por tanto, en los meses de noviembre y diciembre de 1925, siendo sus deberes como tal funcionario público de El Pueblo de Puerto Rico, entre otros, recibir todos los dineros que por concepto de remesas de telegramas y de giros telegráficos enviaban las distintas telegrafistas de las distintas oficinas del Telégrafo Insular de El Pueblo de Puerto Rico; que aun que las remesas por estos conceptos venían dirigidas al Superinten-

dente del Telégrafo Insular, era lo cierto que era el testigo quien las abría y además que le fueron entregadas al acusado José Enrique Pérez, porque era su obligación el recibirlas; que el acusado José Enrique Pérez era su obligación una vez recibidas las remesas por concepto de telegramas, depositarlas en el American Colonial Bank of San Juan, P. R., a favor de El Pueblo de Puerto Rico, en la cuenta oficial del Tesorero de Puerto Rico, que las remesas por concepto de giros telegráficos era la obligación del acusado José Enrique Pérez, una vez recibidas, depositarlas en la cuenta oficial que el acusado José Enrique Pérez llevaba también en el American Colonial Bank, como *Special Disbursing Officer,* del Negociado del Telégrafo Insular de El Pueblo de Puerto Rico. Manifestó además el testigo que el acusado no podía en manera alguna depositar ninguno de dichos fondos en ninguna cuenta particular ni personal del acusado.''

Y en una certificación expedida por el Auditor de Puerto Rico, que copiada a la letra es como sigue:

''Mr. José E. Pérez, Bureau of Insular Telegraph, Department of the Interior, San Juan, P. R.—Sir: In accordance with 'An Act to provide for the audit of claims against the Government and The People of Porto Rico before payment therefor and for other purposes,' approved March 14, 1907, I have the honor to appoint you subject to the approval of the Governor, Special Disbursing Officer, for the purpose of handling all moneys in connection with the new telegraphic money orders system, recently established at the Bureau of Insular Telegraph. When this appointment is approved by the Governor and a bond of $5,000 in favor of The People of Porto Rico is approved by the Auditor and filed with the Treasurer, you will make requisitions for such amount of money as may be necessary, chargeable to the corresponding appropriation, but at no time to exceed the amount of your bond.

''The funds in your hands may be replenished from time to time, as is necessary, by stating a disbursement voucher in your favor supporting same by vouchers and pay rolls, as the case may be, from which payments have been made, properly certified by the proper official.

''You are personally held responsible under your bond, for all funds advanced to you as Special Disbursing Officer, and should you resign or for any reason be separated from your office, you must not return over your funds to your successor but repay all money ad-

vanced to you to the Treasurer of Porto Rico to the credit of the appropriation from which advanced.

"This is very important and for your own protection must be rigidly complied with.

"Respectfully,

"By direction of the Auditor,

"A. G. Bishop,
"Acting Assistant Auditor of P. R."

A nuestro juicio no hubo error. Se admite que el acusado desempeñaba el cargo oficial de Contador, Oficinista y Traductor del Negociado del Telégrafo Insular y la evidencia introducida tiende a demostrar que desempeñaba además el de *disbursing officer* en el propio negociado, nombrado como indica la certificación y actuando de hecho como expresa la declaración.

Se objeta que no se demostró que el nombramiento hubiera sido aprobado por el Gobernador y es lo cierto que no se presentó evidencia alguna de la aprobación. Pero a los efectos de perseguir al acusado por la apropiación de fondos que recibiera en su carácter de *Special Disbursing Officer* no era necesario que se demostrara, bastando probar que fué nombrado y actuó como tal y como tal recibió los fondos de que se apropiara.

En el caso de *People* v. *Cobler,* 108 Cal. 538, la Corte Suprema del Estado dijo:

"Se sostiene que el veredicto no estuvo justificado por la prueba, primero, porque no hubo evidencia suficiente de que Gray era el cobrador o que el acusado fuera su *deputy.*

* * * * * * *

"Bajo la primera de estas contenciones, se alega que el estatuto requiere al asesor o cobrador archivar un juramento de haber tomado posesión de su oficina y una fianza para el fiel cumplimiento de sus deberes y que del récord no aparecía que Gray hubiera nunca archivado tal juramento o tal fianza o que fuera un asesor o cobrador del condado de Los Angeles o que tuviera autoridad para nombrar un *deputy.* Y se dice: 'A fin de demostrar la relación existente entre el acusado y el condado se hacía necesario demostrar que el

acusado actuaba en virtud de la autoridad de un nombramiento legal hecho de acuerdo con la ley y por un funcionario autorizado para hacer tal nombramiento. Y en casos de abusos de confianza esta relación fiduciaria debe demostrarse claramente que existe o no podrá haber una convicción del acusado.' Se alega, además, que aunque aparece del récord que se presentaron algunos documentos en evidencia demostrativos del nombramiento del acusado para el cargo de *deputy* del asesor o cobrador, sin embargo, no se demostró que dicho *deputy*, el acusado, archivó ningún juramento de haber tomado posesión de su oficina o la fianza requerida por la ley a tal *deputy*.

"La sentencia no puede ser, a nuestro juicio, revocada por esos fundamentos. Se demostró claramente que Gray actuaba como asesor o cobrador del condado de Los Angeles durante el año 1893, y que el acusado actuaba como su *deputy*. La ley presume 'que toda persona que actúa en un cargo público fué nombrada debidamente para él' y que 'sus deberes oficiales han sido debidamente llevados a cabo.' Si, por tanto, el acusado mientras actuaba como *deputy* del asesor o cobrador recibió como tal funcionario dineros que pertenecían al condado y fraudulentamente se los apropió para su propio uso, era culpable de abuso de confianza.''

El caso de *El Pueblo* v. *Aparicio,* 42 D.P.R. 3, que invoca en su favor el apelante es distinto. Allí Aparicio fué acusado como auditor municipal, cargo que no llevaba aparejada la custodia de fondos públicos, mientras que aquí se acusa a Pérez como Oficial Receptor del Negociado del Telégrafo Insular, cargo que lleva aparejada la custodia de fondos públicos.

Los errores cuarto y quinto se señalan así: "La Corte erró al estimar que la acusación imputaba a José E. Pérez, el acusado, un delito de abuso de confianza,'' y "La Corte erró al desestimar la moción de *nonsuit* del acusado.''

El fiscal se limita a impugnar el cuarto. Sostiene que el quinto no existe porque debe entenderse que la moción de *nonsuit* fué abandonada al presentar su prueba el acusado.

Conocemos la acusación. La ley aplicable es el artículo 446 del Código Penal, que dice:

"Todo funcionario de Puerto Rico, o de algún municipio, ciudad u otra división civil, o cualquier delegado, secretario, escribiente o

sirviente de dicho funcionario, o cualquier funcionario, director, depositario, secretario, escribiente, sirviente, apoderado o agente de alguna asociación, compañía o corporación (pública o privada), que fraudulentamente distrajere o empleare cualesquiera caudales confiados a su custodia para fines distintos de los correspondientes a su debida y legítima administración, o los ocultare con el fraudulento propósito de distraerlos o emplearlos para tales fines, será culpable de abuso de confianza.''

La jurisprudencia sobre el particular es abundantísima. Alguna de la resumida por Corpus Juris es al efecto de que:

''En una acusación contra un funcionario público o empleado por abuso de confianza es suficiente con que se siga el lenguaje del estatuto y se aleguen los actos y hechos que allí se expresen como constitutivos del delito. El carácter oficial del acusado debe expresarse a menos que la acusación se formule bajo un estatuto que comprenda a toda persona que se apropie fondos públicos; pero no es necesario expresar la fecha y forma de su nombramiento. Además de la alegación del carácter oficial del acusado, la acusación debe expresar que los fondos o la propiedad que hayan sido apropiados fueron recibidos y tenidos por él en virtud de su cargo o empleo; pero no es necesario que el propósito para el cual se le confió dicha propiedad al acusado sea expresado.'' 20 C. J. 476.

Y aquí la acusación sigue al estatuto. Se alega en ella que en diciembre de 1925 y en San Juan el acusado era un Oficial Receptor del Negociado del Telégrafo Insular, o sea, un funcionario de Puerto Rico; que en el desempeño de sus funciones y con intención de defraudar al Pueblo de Puerto Rico, se apropió de cierto cheque recibido en el curso de su empleo y confiado a su custodia, usándolo en su propio beneficio y defraudando de ese modo al Pueblo en $6.21, siendo dicho cheque allí y entonces fondos públicos pertenecientes a y de la propiedad del Pueblo de Puerto Rico. A nuestro juicio es suficiente.

Se insiste, sin embargo, en que de la acusación no surge que el cheque de que se trata perteneciera al Pueblo de Puerto Rico, ni se alega su valor, ni constituye fondos públicos.

El hecho de que el cheque fuera expedido a favor de Otilia Rivera no quiere decir que continuara siendo de su propiedad después de alegarse en la acusación que fué en-

tregado al acusado en el curso de sus deberes oficiales y consignarse expresamente en ella que dicho cheque cuando se lo apropió el acusado constituía fondos públicos de la propiedad de El Pueblo puestos bajo su custodia.

El valor de la cosa apropiada fué alegado al expresarse el del cheque y al sostenerse que El Pueblo fué defraudado por virtud de la apropiación en la misma cantidad, repitiéndola.

■■ Y en cuanto a que el cheque era fondo público, la acusación lo afirma y la afirmación encuentra apoyo en la ley y en la jurisprudencia.

La ley define el delito de abuso de confianza en general como la fraudulenta substracción o malversación de *bienes* por una persona a quien fueron confiados.

El artículo 446 del Código Penal que dejamos transcrito y que se refiere a funcionarios públicos, habla de *caudales* en la edición española, de *property* en la *inglesa*.

Y el 445 prescribe:

"Constituye abuso de confianza la fraudulenta sustracción o malversación de bienes, por una persona a quien habían sido confiados."

Para que el delito constituya *felony* irrespectivamente del valor de la misma, es necesario, pues, que "la cosa sustraída o desfalcada fuere fondos públicos . . . ." *"Be of the public funds . . . ."* dice el original inglés.

Un cheque, según lo define el Código de Comercio, es un mandato de pago por virtud del cual el librador retira todo o parte de los fondos que tiene en poder del librado.

El cheque, según la ley de instrumentos negociables, es uno de ellos y se define como una letra de cambio girada contra un banco y pagadera a su presentación. Código de Comercio, Edición de 1932, pág. 164.

Y Corpus Juris dice que es: "Una orden escrita dirigida a un banco o corredor de bolsa para pagar dinero según se expresa en la misma."

Que un cheque puede considerarse como un fondo ha sido

expresamente resuelto en el caso de *United States* v. *Greve,* 65 Fed. 488, 490, así: "La palabra 'fondos' incluye dinero, y mucho más, como por ejemplo, pagarés, letras de cambio, cheques, giros, bonos y acciones."

También en el de *Montgomery County* v. *Cochran et al.,* 121 Fed. 17, 21, como sigue:

"El uso de cheques, certificados de depósito y otros documentos mercantiles es tan universal en transacciones de importancia que no podemos asumir que la Legislatura de Alabama quiso prohibir su uso en la negociación y venta de bonos. Si Josiah Morris & Co. hubiesen tenido el dinero en metálico a la mano para pagar los bonos en cuestión, la transacción se hubiera llevado a cabo mediante el uso de cheques o de certificados de depósito y a nuestro juicio sin violar con ello los términos del estatuto. Si monedas de plata hubiesen estado en el banco y servido como base de la transacción, su peso (unas 6,546 libras) hubiera hecho necesario el uso de cheques o certificados para finalizar convenientemente la transacción. Por ende, creemos que cheques o certificados de depósito recibidos de buena fe por la junta de rentas y entregados al tesorero, o entregados por orden de la junta de rentas a este funcionario, serían 'fondos o dinero' o el 'producto de la venta' de los bonos en poder del tesorero. El importe del cheque dado en pago del precio de los bonos en poder del tesorero, habiendo éste recibido el mismo como dinero, equivalía a 'fondos o dinero' en su poder dentro del significado del estatuto. No era su deber guardar el cheque, sino hacerlo efectivo y guardar el metálico o los billetes recibidos en pago del cheque. Al hacer esto, él debía acatar la ley del Estado y guardar el dinero en metálico o los billetes bajo su custodia personal, como por ejemplo, en su propia caja de seguridad o en un depósito especial. Se admite que la ley de Alabama es que si el cheque se consideraba como dinero en poder del tesorero equivalía a una malversación (*conversion*) el hacer un depósito general del mismo en el banco. Alston v. State, 92 Ala. 124, 9 South. 732, 13 L.R.A. 659. De existir vacilación al aplicar esta regla general a un depósito hecho es un banco solvente, ella debe ser aplicada sin duda alguna bajo las circunstancias en que el tesorero depositó estos fondos. Si el cheque equivalía a fondos o dinero dentro del significado del estatuto, ello sería concluyente. Pero si era necesario que el cheque fuese cobrado antes que el mismo se convirtiera en dinero, se sostiene con gran énfasis que el efecto del depósito del cheque al crédito del tesorero fué cobrar el mismo. Cuando el cheque fué presen-

tado en el banco y aceptado acreditando su importe al tesorero, el efecto de la transacción en derecho fué igual a si el importe del cheque hubiese sido entregado al tesorero y por éste devuelto al banco.''

Y siendo un fondo, es claro que si formaba parte del caudal del Pueblo de Puerto Rico por haber sido recibido para él por uno de sus funcionarios en el curso de sus deberes oficiales, tenía la condición de fondo público requerida por la ley. En el caso de *El Pueblo* v. *Hamilton*, 32 Pac. 526, se decidió que ''una alegación de que dineros fueron recibidos por el acusado en su capacidad oficial, equivalía a la alegación de un hecho que fija el carácter de dichos dineros como dineros públicos.''

Al discutir este error en su alegato adicional el apelante sostiene además que de la faz de la propia acusación surge la prescripción de la acción ejercitada por el Pueblo. Invoca los artículos 77 y 78 del Código Penal, que disponen, copiados del original inglés:

''Section 77.—There is no limitation of time within which a prosecution for murder, the embezzlement of public moneys, and the falsification of public records must be commenced.

''Section 78.—The prosecution for any felony other than murder, the embezzlement of public money, or the falsification of public records, must be commenced within three years after its commission.''

Concluye que no pudiendo considerarse en manera alguna que la cosa apropiada en este caso sea *''public money,''* la acción debió comenzarse dentro de tres años de la comisión del delito y como se comenzó después, sólo cabe adoptar una sola solución, sobreseer el proceso.

Invoca el mismo caso de *United States* v. *Greve*, 65 Fed. 490, que dejamos citado, en el que en el curso de la opinión se dijo: ''Se imputa al acusado la malversación de dineros y fondos. Las palabras 'dineros y fondos' no tienen idéntico significado.''

Hemos examinado la totalidad de la opinión y creemos que en vez de favorable es adversa a la contención del ape-

lante. Lo que allí se resolvió finalmente fué que dada la forma en que estaba redactada la acusación era demasiado vaga e indefinida, no habiéndose informado al acusado en la manera que tenía derecho a serlo con respecto a en qué consistía el acto delictivo que se le imputaba. La propia corte dijo: "La palabra 'fondos' no aparece usada en la alternativa como sinónima de 'dinero'. Se ha usado en la conjuntiva. Su fin es, y así fué seguramente el propósito al usarlas en esa forma, añadir algo a la palabra 'dinero'."

Y como en repetidos casos se ha resuelto que las frases "fondos públicos" y "dineros públicos" tienen el mismo significado y se han usado indistintamente en las leyes y en la jurisprudencia para expresar lo mismo, debemos decidir que tampoco tiene razón el apelante. Véanse los casos de *City of Sacramento* v. *Simmons*, 225 P. 36; *Aetna Casualty & Surety Co.* v. *Bramwell*, 12 Fed. (2d) 307, y *Bank of Blytheville* v. *State*, 230 S. W. 550.

Es el sexto error el que discute en primer término y con mayor empeño el apelante. Se formula así:

"La Corte erró al no admitir la evidencia del acusado para sostener su alegación de sentencias absolutorias anteriores por el mismo delito, al excluir dicha evidencia de la consideración del jurado y al resolver, como cuestión de derecho, sin someter la cuestión a la consideración del jurado, que no existía identidad entre los delitos absueltos y el objeto de la acusación en el presente caso."

Para sostener sus alegaciones de haber sido absuelto dos veces por el mismo delito presentó el apelante la acusación en la causa núm. 869 en la que se le imputó un delito de Abuso de Confianza (*felony*) por haberse apropiado fraudulentamente, siendo empleado del Telégrafo Insular, durante el período comprendido entre marzo, 1926, y enero, 1927, fondos del Pueblo de Puerto Rico confiados a su custodia ascendentes a $3,399.55, el veredicto de no culpable y la sentencia absolutoria; la acusación en la causa núm. 1058 imputándole el delito de Abuso de Confianza consistente en haberse apropiado fraudulentamente en el mes de

junio de 1927, $330 del Pueblo de Puerto Rico que tenía bajo su custodia por haberlos recibido en el curso de sus deberes oficiales como empleado del Telégrafo Insular, el veredicto de no culpable y la sentencia absolutoria; la acusación en la causa núm. 1057, de la cual aparece que se le imputó un delito de Abuso de Confianza (*felony*) consistente en haberse apropiado fraudulentamente en marzo de 1927, $300 del Pueblo de Puerto Rico que había recibido y tenía bajo su custodia como empleado del Telégrafo Insular y la documentación sobre el incidente de la disolución del jurado que fué llamado para juzgarle, y para relacionar las indicadas causas con ésta y demostrar que las tres eran etapas de una misma transacción criminal, ofreció en evidencia la declaración del experto contable Silvino Díaz. Además, copia de una demanda en cobro de dinero presentada por El Pueblo de Puerto Rico en la Corte de Distrito de San Juan contra José E. Pérez, en la que se alega que el demandado, empleado del Telégrafo Insular, recibió $19,866.90 en el curso de su empleo desde 1923 a 1927 y se apropió de ellos fraudulentamente en perjuicio del demandante.

La declaración del contable es muy extensa y a ella tendremos que referirnos para analizar otros de los errores señalados. A los efectos del estudio y resolución de éste, bastará transcribir lo que sigue:

"Defensa.—P.—Lo que deseo saber es si el perito pudo comprobar en su investigación el plan, el método, la forma y manera en que a su juicio de usted se realizaban las apropiaciones durante cada uno de los meses de marzo, 1926, a enero, 1927, y si ese plan fué el mismo en cada una de ellas?

"R.—Yo encontré que durante los once meses de la acusación él falsificaba las cuentas de San Juan al Auditor por menos cantidad de lo que había recibido del telegrafista local. En cada uno de los meses reportaba a San Juan menos cantidad, como recibida, de lo que en realidad había recibido; al mismo tiempo falsificaba las cuentas del telegrafista en cuanto al negocio hecho. Encontré que en cada uno de los once meses de la acusación el acusado informaba al Auditor en su informe general de todos los pueblos como que había recibido de

San Juan menos cantidad de lo que comprobé que había recibido del telegrafista, y asimismo la cuenta de San Juan, en cuanto al negocio hecho, encontré que era más de lo que el telegrafista había informado al Auditor como que había sido el negocio de San Juan, para que de esa manera cuadrara la cuenta. Eso se hizo en los once meses de la acusación.

❊ ❊ ❊ ❊ ❊ ❊ ❊

"Juez.—P.—¿Cómo suplía, entonces, lo que informaba de menos?

"R.—Por ejemplo, en San Juan él recibía 500 pesos en un check, y recibía de Ponce, supongamos 500 pesos, en diferentes valores, de modo que había recibido 1,000 pesos de las dos estaciones; entonces informaba al Auditor que había recibido de Ponce 500 pesos, que era realmente lo recibido, pero informaba que había recibido de San Juan $200, entonces informaba al Auditor de las dos estaciones 700 pesos, pero como el check de San Juan estaba a favor del Bureau del Telégrafo Insular y no lo podía cobrar, lo depositaba íntegro, pero de Ponce, que recibía valores que los podía depositar, depositaba 500 y tenía depositado 700 pesos que era lo mismo que le decía al Auditor que había recibido de San Juan y Ponce, y así se podía quedar con los 300 pesos de Ponce, y la estación que informaba de menos era San Juan. Ese fué el plan que siguió.

"Defensa.—P.—¿Que siguió desde 1923 hasta 1927?

"R.—Sí, señor."

Durante el curso de la declaración del contable el fiscal hizo las siguientes admisiones:

"Def.—El señor fiscal acepta que bajo la acusación del Gran Jurado de 28 de marzo, 1928, contra el acusado José Enrique Pérez, por la apropiación formulada de fondos del Telégrafo Insular, en un montante de $3,399.55, en su carácter de oficial receptor del Telégrafo Insular, durante el período comprendido desde el mes de marzo, 1926 a enero, 1927, se presentó prueba al jurado que entendió del caso, de once apropiaciones diferentes, en cada uno de dichos meses, en contra de la objeción de la defensa que solicitó de la Corte que se compeliera al fiscal a elegir entre las distintas apropiaciones en que ofreció prueba, moción que fué denegada por la corte.

"Fiscal.—Yo acepto eso, haciendo una salvedad, de que en ellas no estaba el check de $6.21, ni se presentó ninguna prueba sobre ella."

Citada la evidencia e invocada la jurisprudencia que

estimó pertinente, expone su teoría el apelante en su alegato
así:

"Ahora bien, la declaración del experto contable Silvino Díaz, las
admisiones del Fiscal en el acto del juicio y la admisión del Pueblo de
Puerto Rico por su Attorney General en la demanda civil contra el
acusado, identifican las cuatro acusaciones, la presente, las dos an-
teriores de que el acusado fué absuelto y la otra anterior en que fué
expuesto, como etapas de una sola transacción criminal, como esla-
bones de una cadena que culminó en la apropiación de la suma de
$19,866.90.

"Éste es el delito, el quebrantamiento por el acusado de su *trust*,
de la confianza depositada en él, apropiándose la referida suma. El
proceso, el plan seguido para la perpetración del delito fué el des-
crito por el contable, sucesivas retenciones o distracciones de fondos
durante un largo período, 'small peculations' como las denomina la
jurisprudencia. Cada una de estas infinitas peculaciones no es un
delito separado e independientemente, todas forman una serie, dima-
nadas de la misma intención criminal, puestas en práctica obedeciendo
a un solo impulso.

"Se dividiría la unidad que debe existir entre el acto y la inten-
ción (Art. once Código Penal) si se dividiera la integridad del acto
criminal 'apropiación por el funcionario de los fondos confiados a
su custodia,' en tantos actos delictivos como meses, como días, duró
la ejecución del propósito, como valores diferentes fueron apropiados
en cada día, como pesos y centavos constituían dichos valores.

"No hay base racional alguna para la división en partes del pro-
ceso criminal que culminó en la apropiación de la suma de $19,866.90.
Tan arbitrario es dividirlo en períodos de varios meses, como se hizo
en la primera acusación absuelta (marzo, 1926, a enero de 1927,
ambos inclusive, once meses $3,399.55), como dividirlos en períodos de
un mes (junio de 1927 en la segunda acusación por $3,330—marzo
de 1927, la tercera), o en tantos actos como cheques o valores apro-
piados. En cualquier caso haría una división de la entidad, del acto
criminoso, de la serie de la transacción. Existiría el 'Splitting' con-
denado por la jurisprudencia universal, porque pone en poder del
Estado la facultad de vejar y oprimir al acusado, porque convierte
al poder público en *persecutor* y no en *prosecutor* de actos punibles."

Después de un detenido estudio de los hechos y la ley,
estamos convencidos de que la corte actuó correctamente al

decidir que el acusado no fué absuelto ni estuvo expuesto por el mismo delito en las causas números 869, 1058 y 1057.

El delito de Abuso de Confianza no es por su propia naturaleza una ofensa continua. Cada sustracción o malversación constituye un delito completo y distinto. Así se resolvió en el caso de *Storm* v. *Territory,* 94 Pac. 1099, en que se dijo: "El delito de abuso de confianza no es uno continuado sino que es uno en el cual cada apropiación constituye un delito distinto."

Lo que sucede es que teniendo que enfrentarse los legisladores y las cortes con un delito generalmente cometido por personas expertas en contabilidad que hacen muy difícil la fijación de la exacta fecha de cada una de las apropiaciones del desfalco final que se descubre, se ha permitido que se acuse por una serie de apropiaciones como si todas constituyeran un solo delito. Claro es que cuando esto sucede, no puede acusarse luego por cada una de las apropiaciones comprendidas en la serie si el acusado es absuelto, pero aquí la apropiación imputada en la acusación se verificó en diciembre de 1925, no estando, por consiguiente, comprendida en las de la causa núm. 869 que lo fueron de marzo, 1926, a enero, 1927, ni en las de la causa núm. 1058, que tuvieron lugar en junio de 1927, ni en las de la causa núm. 1057 que se verificaron en marzo de 1927. El que se siguiera en todas el mismo método, no importa.

En el caso de *State* v. *Moland,* 19 S. W. 715, se decidió:

"El delito de abuso de confianza es necesariamente muy peculiar en sus características, y lo es más aún cuando un funcionario se apropia fondos en virtud de su cargo. Dicho funcionario no está en las mismas condiciones que un empleado cualquiera. No tiene a nadie que lo vigile ni que vigile la manera cómo lleva a cabo sus funciones. Evidentemente, si las estrictas reglas de la ley común que requerían que el estado demostrara exactamente cuando dicho funcionario recibió determinados fondos, el carácter de dichos fondos, esto es, si giros y billetes o moneda, y sus denominaciones, y se requería además que mostrara cómo se llevó a cabo la apropiación, entonces el estatuto resultaría claramente letra muerta. De acuerdo con esa situación las

cortes de este país unánimemente no han considerado los precedentes de la ley común como obligatorios bajo estatutos similares y aunque han requerido que se cumpla sustancialmente con los requerimientos estatutarios y que se preste consideración a las garantías constitucionales, dichas cortes han interpretado la ley liberalmente. La relación fiduciaria de que disfruta el funcionario le pone en condiciones de apropiarse fondos para su propio uso, y al mismo tiempo hace imposible para el Estado el poder por anticipado imputar cuándo y cómo dicha apropiación fué hecha. El delito de abuso de confianza frecuentemente consiste de una serie de actos llevados a cabo en fechas diferentes pero con un designio común hasta que por último aparece el hecho del desfalco. Todo lo que puede decirse es que ha habido un desfalco cierto. Los fondos públicos han sido desfalcados hasta una determinada cantidad. El requerir al Estado que elija o seleccione un delito determinado y obligarlo a que haga un caso de ese hecho solamente, resultaría frecuentemente· desastroso y el delito quedaría impune. Por tanto, cuando el acusado es advertido de la imputación del desfalco de determinada cantidad, el carácter oficial en que él recibió dicha cantidad y de habérsela apropiado él, ha sido suficientemente informado de la naturaleza y causa de la acción.''

Y en el de *State* v. *Davis,* 92 Atl. 821, la Corte Suprema de Rhode Island hace un extenso estudio sobre el particular, del que transcribimos lo que sigue:

''. . . Asumiendo a los solos propósitos de la argumentación que exista una forma de abuso de confianza que pueda caracterizarse como delito continuo, la forma en que esté redactada la acusación puede ponerlo de manifiesto, pero eso no excluye otras formas del delito. No puede decirse, por tanto, que tal forma de acusación se refiera únicamente a un delito continuo, y siendo esto así, la segunda cuestión debemos contestarla en la negativa.

''En todos estos diez casos que consideramos se radicaron a petición del acusado 'bills of particulars' idénticos en cada caso. La tercera cuestión que se nos ha planteado presenta, en síntesis, el primer apartado del 'bill of particulars.' El propósito de dicha tercera pregunta es: ¿Imputan estas acusaciones que alegan en términos generales apropiaciones de dinero y en que se demuestra la intención de probar apropiaciones llevadas a cabo por el acusado de tiempo en tiempo durante ·el período a que se refiere la acusación, un delito continuado sujeto a un solo proceso y a una sola pena hasta la fecha en que se presentaron dichas acusaciones?

"Esta cuestión requiere alguna consideración acerca del carácter del delito de abuso de confianza y acerca del efecto, si alguno, que haya tenido la sección 18 especialmente al respecto de haberlo convertido en un delito continuado. La regla general está perfectamente establecida de que cuando se trata de un delito continuado, solamente, puede caber un solo proceso. Una acusación en tales casos por una parte de los artículos tomados, absorbe todo el delito. La transacción no puede ser dividida en una serie de casos. Wharton's Crim. Law, Vol. I, par. 27, 931; State v. Martin, 23 R. L. 143, 146, 49 Atl. 497; In re Snow, 120 U. S. 274. En este último caso se imputó el delito de vivir y cohabitar ilegalmente con más de una mujer. La corte dijo:

" 'El delito de vivir o cohabitar ilegalmente, de acuerdo con el estatuto, se comete cuando se vive bajo techo juntos como marido y mujer. Es un delito inherentemente continuo, tiene duración y no es un delito que consista de un acto aislado.'

"Ese caso pone de manifiesto las ordinarias y esenciales características de un delito continuado.

"Esta cuestión de 'delitos continuados' es realmente importante, porque hay diez acusaciones aquí que cubren períodos sucesivos de seis meses hasta completar cinco años. El delito de abuso de confianza se asemeja en muchos de sus particulares al delito de hurto de la ley común. En los Estados Unidos se ha resuelto generalmente que la sustracción como un solo acto y en un mismo momento y sitio de varios artículos, constituye un delito distinto de hurto. La ley aplicable al abuso de confianza en este respecto es la misma que para el hurto.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"En vista del propósito de tales estatutos, entendemos que las palabras 'prueba puede ser introducida de cualquier abuso de confianza cometido dentro de los seis meses' deben ser interpretadas como que permiten prueba de diferentes apropiaciones dentro de 'tal período como si constituyeran un solo delito a los fines de obtener una convicción basada en la cantidad total apropiada.' Esta interpretación está sostenida por el gran peso de las autoridades. Pero al aceptar estos puntos de vista, no consideramos de ningún modo el delito como uno continuado. Según hemos dicho, la sección 18 es simplemente una modificación del procedimiento a fin de asegurar la convicción de los que cometen abusos de confianza. Si bajo tal acusación y de su 'bill of particulars' que contiene la intención de probar dos o más sustracciones se pudiera deducir la existencia de un delito continuado, entonces, como hemos demos-

trado, el resultado sería que en un caso donde las apropiaciones de un acusado se extendieran a un período de varios años, el estado estaría por virtud del propio estatuto prohibido de perseguirle por ningunas otras apropiaciones que no se hubieran cometido dentro del período de seis meses que se hubiera elegido del período total. Esto destruiría más bien que cumplir el propósito de tales estatutos. El mismo hecho de limitar la evidencia a solamente un período de seis meses, parece negar claramente la alegación de que se trata de un delito continuo. Si el delito fuera en efecto continuo ¿por qué no había de permitírsele al estado demostrar hasta donde el estatuto de prescripción lo permita, todas las apropiaciones llevadas a cabo por el acusado? El asumir que el estado se ha atado sus propias manos al tratar de obtener mayor libertad de acción, no es lógico. Creemos que la diferencia entre delitos inherentemente continuos y delitos esencialmente distintos e individuales en su carácter, pero los cuales pueden ser consolidados dentro de ciertas circunstancias y tratados como uno solo, ha sido claramente expuesta en el caso de Re Henry, 123 U. S. 372. Este caso surgió bajo la sección 5480 de los Estatutos Revisados de los Estados Unidos que prohibe el uso fraudulento del correo. Dicho artículo provee, entre otras cosas que:

" 'La acusación, información o denuncia pueden separadamente imputar delitos hasta el número de tres cuando se han cometido dentro de los seis meses, pero la corte impondrá una sola sentencia.'

"Se habían presentado dos acusaciones y había habido dos convicciones por uso fraudulento del correo cometido dentro de los mismos seis meses. La corte se expresó así:

" 'Nosotros . . . no podemos convenir en que sólo pueda haber un solo castigo por todos los delitos cometidos por una persona de acuerdo con el estatuto dentro de un cualquier período de seis meses.

" 'Cada carta que se saque del o se ponga en el correo constituye una separada y distinta violación de la ley. No ocurre lo mismo que en el caso In re Snow, 120 U. S. 274, en que el delito era uno continuo sino que consiste de un acto aislado que es repetido tan frecuentemente como se repite el acto. Se provee que tres distintos delitos cometidos dentro de los mismos seis meses pueden ser acumulados en la misma acusación; pero esto no es sino equivalente a permitir que se acumulen tres delitos con el propósito de un solo juicio. Ese es todo el alcance y significado del precepto y no hay nada en dicho precepto que indique su intención de convertir en un solo delito y castigable como tal, delitos absolutamente distintos y comprendidos en sí mismos.'

"En Howard v. United States, 75 Fed. 986, el acusado fué convicto bajo ocho acusaciones por violar dicha sección 5480 y fué sentenciado en cada una de ellas. Nosotros creemos que los casos de autos son claramente distinguibles de casos por mantener un estorbo público, practicar la profesión dental o por practicar el juego prohibido como profesión. En tales casos, la continuidad es el alma del delito. State v. Smith, 35 R. I. 285; State v. Martin, 23 R. I. 143; State v. Groves, 21 R. I. 252; State v. Melville, 11 R. I. 417. Aún en delitos de esa clase, acusaciones que cubrían sucesivos períodos han sido declaradas permisibles. Comm. v. Connors, 116 Mass. 35; People v. Gault, 104 Mich. 575, el cual fué un caso por tener ilegalmente licores para la venta.

"Secor v. State, supra, y People v. McKinney, supra, son ambos casos de abuso de confianza. Ellos son perfectamente aplicables al punto que discutimos, pues son acusaciones bajo estatutos iguales al nuestro y ambos resuelven 'que el delito no es uno continuo así como que pueden presentarse acusaciones separadas. En Secor v. State, había una sola acusación en dos 'counts' que eran idénticas, excepto con respecto a las cantidades y a las fechas que eran de seis meses de separación. Veredictos en ambos casos fueron sostenidos. En People v. McKinney hubo una acusación conteniendo ocho 'counts', cada uno por la apropiación de $4,000 en distintas fechas incluyendo todos un período de seis meses. Y a la página 95 del volumen 10 de Michigan, la corte se expresa así:

" 'Cuando los varios delitos imputados aunque distintos como cuestión de derecho, surgen sin embargo de la misma transacción o están conectados ''en sus hechos que substancialmente hacen una misma transacción o serie conectada de hechos, no puede considerarse que existe perjuicio para el acusado en su defensa porque se acumulen tales acciones, y la corte no rechazará la acusación ni obligará que se elija determinada apropiación.'

"Si varios 'counts' pueden consolidarse en la misma acusación y un veredicto separado puede rendirse en cada 'count', no vemos razón por qué acusaciones separadas en vez de 'counts' separados no pueden permitirse. En algunos de los casos citados por el acusado se usan expresiones con referencia al delito de abuso de confianza que indican el concepto de continuidad como una característica del delito. En State v. Reinhart, 26 Ore. 466, y State v. Dix, 33 Wash. 405, se usa la expresión 'delito continuado.' En Brown v. State, 8 Ohio St. 496, se usa la frase 'una serie continuada de apropiaciones', y en Underhill on Criminal Evidence, párrafo 289 se usan las palabras 'una serie continuada de actos o apropiaciones.'

El error de estas expresiones nos parece que estriba en que las mismas confunden la idea de continuidad, que es característica del servicio o empleo continuo del empleado o agente con sus actos de apropiaciones separadas y distintas llevados a cabo en fechas distintas durante el período de tal servicio o empleo.''

. Bajo las circunstancias que en el caso concurren pudo la corte resolver por sí misma la cuestión planteada sin someterla al jurado.

La identidad de acusaciones a los efectos de un *former jeopardy* o de una absolución anterior puede envolver una cuestión de hecho que debe someterse al jurado o simplemente una de derecho que puede ser resuelta por la corte.

Si aquí se hubiera alegado que la suma apropiada estaba comprendida en las sumas apropiadas en los casos números 869, 1058 y 1057 y se hubiera introducido evidencia sobre ello, la resolución hubiera sido de la incumbencia del jurado, pero aquí se acepta que no estaba comprendida de hecho, estándolo únicamente a virtud de considerarse el delito de abuso de confianza como una ofensa continua y tratarse de una sola transacción que duró desde 1923 a 1927. Y esto era una cuestión de derecho cuya resolución competía exclusivamente al tribunal.

Los errores séptimo y octavo se formulan como sigue:

''7. La Corte erró al admitir la evidencia del Fiscal de supuestos delitos anteriores cometidos por el acusado y al rechazar la evidencia del acusado tendente a probar la no comisión de los mismos.

''8. La Corte erró al no instruir al Jurado al recibirse la evidencia de supuestos delitos anteriores que el solo efecto de la misma era demostrar que el supuesto acto de apropiación de un check imputado en la acusación del presente caso se había cometido con intención criminal.''

El fiscal presentó en evidencia otros cheques que habían sido apropiados por el acusado en la misma forma que el que sirve de base a la acusación con el propósito de demostrar

su intención fraudulenta, y la corte los admitió con la oposición de la defensa.

La regla es que no puede presentarse prueba de otros delitos. La evidencia debe circunscribirse al que se persigue. Pero existe la excepción de que cuando lo que se trata de demostrar con la prueba de esos otros delitos es la intención fraudulenta con que actuó el acusado en el que se persigue, dicha prueba es admisible. Véase lo que dice sobre el particular la Corte Suprema de California en el caso de *People v. Gray*, 66 Cal. 271. Es así:

"En el juicio de este caso al fiscal se le permitió probar contra la objeción del acusado, varios otros actos de abuso de confianza cometidos por el acusado además de aquél imputado en la acusación; y ésta nos parece ser la más formidable objeción tomada a los procedimientos por el acusado en esta apelación. Se alega que no puede introducirse prueba por parte del estado en relación con otros delitos que no sea el imputado, y tal doctrina como regla general, es indudablemente la verdadera; pero existen excepciones a esta regla general. En el caso de autos, el claro propósito del fiscal al introducir la prueba de otros actos de apropiación fraudulenta de fondos públicos por el acusado, fué sencillamente demostrar el conocimiento criminal y la intención fraudulenta en la apropiación de los $700 mencionados en la acusación; y hay innumerables autoridades al efecto de que dicha evidencia es competente para tal fin. En Wharton on Evidence, sección 46 y siguientes se dice: 'que cuando la cuestión en controversia es la intención fraudulenta o el conocimiento criminal del acusado, prueba de actos similares o de la misma naturaleza, son admisibles.' (Véase también Roscoe's Cr. Ev. PP. 88, 89, 90.)

"En una acusación por recibir artículos hurtados, puede introducirse evidencia de haber recibido varios de los artículos hurtados, con el propósito de demostrar el conocimiento criminal o la intención fraudulenta. (State v. Goetz, 34 Mo. 89.) Así también cuando una persona es acusada de falsificación y alteración con intención criminal de una letra de cambio se decidió que otras letras de cambio falsificadas encontradas en posesión del acusado, podían ser presentadas en evidencia. (Spencer v. Commonwealth, 2 Light, 751). En un proceso por ataque con intención de cometer violación, previos ataques llevados a cabo en la perjudicada con intenciones simi-

lares, son competentes y admisibles como evidencia. (William v. The State, 8 Humph. 585.) Así también, en una acusación por suministrar ácido sulfúrico con intención de matar caballos, actos de haber suministrado dicho ácido sulfúrico en otras fechas con igual propósito, fueron permitidos como evidencia admisible. (Rex v. Mogg, 4 C. & P. 364.) En procesos en que una persona es acusada por disparar maliciosamente, Mr. Russell dice que puede presentarse evidencia de que el acusado en otras fechas intencionalmente disparó a la misma persona. (Russell on Crimes, volumen 2, página 277). 'Prueba de otro acto de apropiación fraudulenta por el acusado llevado a cabo durante la misma semana en que se llevó a cabo el delito imputado en la acusación es prueba admisible para demostrar la intención fraudulenta y el conocimiento criminal.' (Commonwealth v. Shepard, 1 Allen 581.) En caso de asesinato por medio de veneno, prueba de actos previos de envenenamiento por el acusado, es admisible. (Rex v. Gearing, 18 L. J. 215; King v. Wylie, 1 Bos. & P.N.R. 92; Rex v. Bleasdale, 2 G. & K. 765). Con el propósito de demostrar la intención criminal, prueba es admisible de que el acusado había previamente pasado monedas falsas, aún cuando dichas acusaciones estén pendientes. (Commonwealth v. Stearns, 10 Met. 256.) 'Aún cuando se prueben hechos que no están conectados con la transacción que constituye el delito, para demostrar el conocimiento criminal, deben considerarse como admisibles y competentes, toda vez que tienden a demostrar un elemento esencial del delito como es el conocimiento criminal de un hecho determinado.' (Copperman v. The State of New York, 56 N. Y. 592). 'Siempre que la intención fraudulenta o el conocimiento criminal de una persona sea un elemento esencial del delito, hechos colaterales, esto es, los hechos y declaraciones de carácter similar que tiendan a establecer tal intención criminal o conocimiento son evidencia admisible. (Frydam's Case, 31 Gratt 872. Coleman v. The State, 58 N. Y. 555; Shriedley v. State, 23 Ohio St. 130.) Tal clase de evidencia es admisible en dondequiera que se hace necesario establecer la intención fraudulenta o el conocimiento criminal.

''Existen otros muchos casos a los que podríamos referirnos, pero los que hemos citado son suficientes para demostrar que existen excepciones a la regla general que limita la prueba en casos criminales al delito imputado.''

La cuestión no es nueva en esta jurisdicción. Fué estudiada en el caso de *El Pueblo* v. *Juarbe,* 43 D.P.R. 448. En él se decidió que como excepción a la regla general, ''prueba

de delitos anteriores es admisible para demostrar conoci-
miento, intención, designio y plan."

No hubo error en la admisión y en cuanto a la limitación,
no obstante no haberse solicitado, la corte por sí misma dió
al jurado la siguiente instrucción:

"Todos los cheques admitidos en evidencia con excepción del que
es objeto de la acusación están a la consideración del jurado sola-
mente para el propósito de demostrar la intención del acusado al
convertir el cheque de $6.21 en dinero, y esto únicamente en el caso
de que el jurado llegue a la conclusión fuera de toda duda razona-
ble de que el acusado convirtió dicho cheque en dinero y privó al
Pueblo de Puerto Rico de la suma de $6.21, apropiándose dicha
suma.

La cuestión de la negativa a admitir la prueba ofre-
cida por el acusado para demostrar que no había cometido
tales delitos la estudiaremos luego por ser la misma que la
suscitada con motivo de la negativa de cierta prueba ofrecida
por el acusado para demostrar que no había cometido el delito
que se le imputa.

Por el señalamiento noveno se sostiene que "La Corte
erró al rechazar la declaración del testigo Rodolfo Torres,
demostrativa de que era costumbre en la oficina del Super-
intendente de Telégrafos cambiar por dinero valores enviados
por los telegrafistas de la Isla, con el fin de depositar los
fondos de giros telegráficos y los generales del telégrafo en
sus cuentas correspondientes, cuando las remesas correspon-
dientes a uno y otro fondo no venían separadas, sino involu-
cradas o incluídas en un solo giro o valores equivalentes."

A nuestro juicio la regla de la corte estuvo justificada
porque la declaración del testigo sólo hubiera podido de-
mostrar que en otras ocasiones se habían cambiado cheques
por dinero, o sea, algo que directa ni indirectamente podía
destruir la imputación hecha al acusado de haberse apropiado
el cheque de $6.21. El testigo pudo cambiar cheques por
dinero y eso no obstante haber ingresado el dinero en los
fondos del Pueblo, pero eso no podía demostrar que el cheque

de $6.21 que ingresó el acusado en su cuenta particular del Banco Popular lo convirtiera en dinero y lo ingresara en el American Colonial Bank en la cuenta del Pueblo.

El décimo error se discute en el alegato conjuntamente con el dieciséis. Se sostiene por el décimo que la corte erró al rechazar la declaración del telegrafista Venegas acerca de que en diciembre de 1925 dejó de remesar diez dólares que recaudó en su oficina de Mayagüez por haberlos entregado al Superintendente del Telégrafo Manuel Rodríguez con orden de éste de que los descontara de la remesa, y por el décimosexto que la corte erró al excluir las declaraciones de los testigos Laborde, Landreau, Guzmán y Moreno sobre entregas por ellos como telegrafistas al Superintendente Rodríguez de fondos del telégrafo que dejaban por orden suya de remesar al negociado.

Argumentando la pertinencia de esas declaraciones insiste el apelante en que debieron ser admitidas porque ellas revelan actuaciones ilegales y delictivas por parte de su inmediato Jefe el Superintendente y pregunta: "¿No revela esa actuación del Superintendente una podredumbre moral en su oficina y no es, por lo menos, una atenuación de cualquier actuación ilegal del contable, el verse obligado a servir de pantalla a las actuaciones delictivas de su Jefe?".

Creemos que la corte estuvo justificada al negarse a admitir las declaraciones de que se trata tanto porque eran inmateriales cuanto porque tendían a confundir la mente del Jurado. El que pudieran haberse cometido otros delitos de abuso de confianza por otras personas en el telégrafo, no justifica la perpetración del que se imputa al acusado en esta causa.

El error décimoséptimo es de la misma naturaleza de los que acabamos de estudiar y resolver, o sea, de los señalados con los números 9, 10 y 16.

El señalamiento marcado con el número 11 es al efecto de que la corte erró al rechazar la declaración del Con-

table Silvino Díaz con respecto al resultado de su investigación.

A preguntas de la defensa el Contable fué explicando el mecanismo de los giros telegráficos y en qué consistía y cómo se manejaba el fondo de cinco mil dólares adelantado por el Gobierno para su pago. Finalmente se cruzó el siguiente interrogatorio:

"P.—¿Esa cuenta hay que liquidarla anualmente?

"R.—Anualmente no hay que liquidarla; se continúa. Lo que tiene que hacer anualmente es devolver los cinco mil dollars adelantados, pero los recibe inmediatamente.

"P.—¿El *special disbursing officer* recibe todos los años en primero de julio cinco mil dollars?

"R.—Sí, señor.

"P.—¿Y el 30 de junio debe devolverlos al Tesorero de Puerto Rico?

"R.—Sí, señor.

"P.—¿Ud. tiene los documentos demostrativos de la devolución al Tesorero de Puerto Rico de ese fondo de cinco mil dollars por el *special disbursing officer*, al expirar el año económico de 1925 al 1926?

"R.—Sí, señor.

"P.—¿Puede producirlos?"

Intervino entonces el fiscal. Se ordenó al jurado que se retirara. Y ocurrió lo que sigue:

"FISCAL: Nosotros entendemos que toda esta prueba y todo este interrogatorio, en cuanto a los giros telegráficos y mecanismo y documentos que se solicitan, es completamente inmaterial e impertinente al caso que estamos investigando. Aquí se trata de un *check* de $6.21. . . Desearía saber el propósito de la prueba.

"DEFENSA: Le voy a explicar. Las remesas que hacían los telegrafistas eran por dos conceptos, o fondos recaudados por telegramas y telefonemas o por giros telegráficos. Estas remesas van informadas por documentos separados, pero la remesa que se hacía a fines de mes, aunque venía en informes separados, los valores pueden venir y venían muchas veces involucrados, sin separar los valores correspondientes a giros y los correspondientes a telegramas. Se ha presentado este check. Nosotros interrogamos a la telegrafista de Coamo para que dijera si este check se remitió como parte de los giros telegráficos o de telegramas. Ella no pudo decirlo. Dijo

que no sabía; por lo menos ella no pudo aclararlo. De manera que nosotros tenemos que ir a las dos cuentas para demostrar que las dos están completas. Esta prueba tiende a demostrar que si el acusado a fines del año económico del 25 al 26, devolvió al Tesorero los cinco mil dollars que había recibido, que formaban el fondo de giros telegráficos, cumplió con sus deberes de *special disbursing officer*, y no hubo apropiación ni se apropió de este check como parte de ese fondo.

"FISCAL: Es que el documento que se presenta como prueba en absoluto puede probar lo que la defensa intenta probar. Por eso es que decía que este documento es completamente inmaterial e impertinente.

"JUEZ: La Corte entiende que la prueba es inmaterial, porque el hecho de que esta cuenta por concepto de giros telegráficos esté correcta, no destruye el caso prima facie, del fiscal, de que el acusado se haya apropiado del check en cuestión.

"DEFENSA: Excepción a la resolución de la Corte por el fundamento de que la prueba del fiscal no ha fijado de qué fondo procedía el check de Otilia Rivera, o sea, si la remesa que ésta hiciera fué por concepto de giros telegráficos o de fondos generales del telégrafo, y en este sentido tiene la defensa derecho de probar que ese check no fué remitido por concepto de giros telegráficos o que fué enviado, aunque está en la cuenta corriente e ingresó en la cuenta de giros telegráficos; y anunciamos a la Corte que deseamos producir esa evidencia en presencia del Jurado.

"JUEZ: Se deniega la moción.

"DEFENSA: Tomamos excepción y sin renunciar a la excepción vamos a producir la evidencia fuera de la presencia del Jurado.

"P.—Dígame testigo, ¿éstos son los documentos que le pidió la defensa con respecto al depósito en la cuenta del Tesorero de Puerto Rico, de la cantidad de cinco mil dollars del negociado de giros telegráficos?

"R.—Esto fué lo que se me entregó por la oficina del Auditor.

"P.—¿Ésa es la documentación a que se refiere la defensa?

"R.—Sí, señor.

"DEFENSA: Ofrecemos en evidencia estos documentos.

"FISCAL: Nos oponemos por los fundamentos expuestos y que constan en el récord: completamente inmateriales.

"JUEZ: La Corte no los admite por los fundamentos anteriores.

"DEFENSA: Que se marque Ex. 4-A, el certificado del Tesorero y del Auditor reconociendo el pago por José E. Pérez, el acusado, de la suma de cinco mil dollars, al Tesorero de Puerto Rico, por con-

cepto de giros telegráficos. Copia de una carta del Auditor al Tesorero de Puerto Rico en conexión con este asunto. Un abstracto de desembolsos. Un certificado del tenedor de libros y jefe de división de cuentas de Auditoría. Y la cuenta corriente de José Enrique Pérez como *special disbursing officer* del Bureau del Telégrafo Insular, con el Tesorero de Puerto Rico, por concepto de giros telegráficos, debidamente aprobada por el Comisionado del Interior y por el Auditor de Puerto Rico. Desde el A hasta el E. Y tomamos excepción de la resolución de la Corte por los motivos expuestos anteriormente. Para los efectos del récord deseamos anunciar lo siguiente para que la corte dé un *ruling*: la defensa ofrece en evidencia en relación con los meses en los cuales el fiscal ha presentado cheques como prueba de corroboración de intención, los mismos documentos que han sido presentados en evidencia en relación con los meses de noviembre y diciembre, con el fin de probar que las cuentas del acusado están correctas, que concuerdan con los resúmenes de los distintos telegrafistas de la Isla que han sido aprobados por el Auditor de Puerto Rico, y el montante que arrojan esas cuentas, incluyendo la oficina del telégrafo de donde proceden esos checks que han sido presentados, concuerdan con la cuenta en el American Colonial Bank del Tesorero de Puerto Rico.

"Fiscal: Nosotros nos oponemos por los mismos fundamentos que constan en el récord.

"Juez: La misma resolución que se dió en cuanto a los documentos de noviembre y diciembre.

"Defensa: La misma excepción por los fundamentos anteriormente expuestos."

Es este error y los señalados con los números 12 al 15 que analizaremos en seguida los que nos hacen vacilar en la resolución de este caso por el temor de aceptar como legales resoluciones que pudieran haber producido la indefensión del acusado.

Dichos errores 12 al 15 se argumentan conjuntamente en el alegato del apelante. Se refieren a la negativa de la corte a admitir en evidencia el libro de caja que llevaba el acusado, los resúmenes de las operaciones de la oficina del Telégrafo de Coamo de noviembre y diciembre, 1925, y de las otras oficinas de la Isla, las cuentas de todas las oficinas telegráficas de la Isla de noviembre y diciembre, 1925, rendidas por

el Superintendente del Telégrafo al Comisionado del Interior y por éste al Auditor, aprobadas por el último, y el comprobante expedido por el Tesorero de Puerto Rico al Negociado del Telégrafo Insular de haberse depositado la suma ingresada en el Negociado en el American Colonial Bank por ingresos del Telégrafo durante los meses de noviembre y diciembre, 1925.

"La Corte podrá ver," dice el acusado apelante en su alegato, "que la prueba rechazada era eminentemente material y pertinente para demostrar que el acusado no obró fraudulentamente al depositar en su cuenta corriente el cheque de $6.21 . . ." Y sostiene el fiscal en el suyo que la prueba no era admisible por haberse preparado por el propio acusado para ocultar su fraude.

Se concibe sin dificultad el porqué de la actitud de ambas partes y lo difícil de la situación de la corte. El fiscal lucha porque el acto delictivo imputado al acusado no se complique. La defensa tiende a extender el campo de la investigación. La corte, dándose cuenta de su grave responsabilidad, con la experiencia de lo ocurrido anteriormente, comprendiendo lo arriesgado de someter una multiplicidad de cuestiones al jurado, trata en todo lo posible de circunscribir a lo fundamental el debate.

Lo serio del caso es que por más esfuerzos que se hagan, el hecho que se imputa al acusado se complica al tratar de probar su intención fraudulenta. La apropiación del cheque no es suficiente por sí sola. Puede constituir una mera irregularidad si no lo fué con la intención de defraudar y su importe se ingresó en los fondos de El Pueblo. El propio fiscal, para demostrar esa intención, se vió obligado a recurrir a la prueba de otros hechos similares sobre la base de que la sistemática repetición de los mismos implicaba el fraude. Pero ello sería así sólo en el caso de que esos otros hechos no constituyeran meras irregularidades sino verdaderos delitos. Y según el acusado la prueba de que se trata no sólo tendía a demostrar la falta de intención criminal en cuanto

a la apropiación del cheque de $6.21, si que de todas las otras apropiaciones similares sobre las cuales se admitió prueba al fiscal, basándose en que si bien los cheques aparecían depositados en su cuenta particular lo cierto era que su importe se había ingresado en el tesoro público.

El juicio se estaba celebrando ante un jurado. Era el jurado el que tenía que decidir si la apropiación del cheque en cuestión había sido o no con el propósito de defraudar al Pueblo y a nuestro juicio tenía el acusado derecho a llevar ante él su prueba y al no permitírselo erró la corte de modo tal que nos veremos obligados a revocar su sentencia concediendo la celebración de un nuevo juicio.

Si la prueba es amañada, si el fraude en realidad de verdad existió, corresponde al fiscal demostrarlo. Todos los hechos deben ir al jurado para que su veredicto sea el resultado de un examen consciente del caso que se somete a su consideración y decisión.

Los restantes errores se refieren a los cometidos según el acusado por la corte al dar sus instrucciones al jurado, al negar la concesión de un nuevo juicio y al imponer la pena. No será necesario considerarlos, en atención a la resolución a que acabamos de llegar. Un nuevo juicio tendrá que ser concedido.

Tal vez para confirmar la sentencia podría sostenerse que de la propia declaración de Silvino Díaz, testigo presentado por el acusado para ofrecer la prueba, podría deducirse la falsedad de la misma tan claramente que el error de la corte podría calificarse de no perjudicial, ya que sometida dicha prueba al jurado éste necesariamente hubiera decidido que no tenía el alcance que pretende el acusado, quedando en pie su intención criminal como algo que surge de sus propias actuaciones a través de toda la evidencia aportada en el juicio.

Sin embargo, tras honda meditación, consideramos que iríamos demasiado lejos si a tal conclusión llegáramos. No es posible predecir con absoluta certeza cuál hubiera sido la decisión del jurado, ni estamos en verdad en condiciones de

juzgar el pleno alcance de la prueba. Las apreciaciones del testigo Díaz pudieron ser erróneas. Las cuentas, los libros y los informes debieron estar al alcance del jurado y la prueba de cargo debió demostrar en qué eran incorrectos o, por encima de su aparente corrección, el fraude imputado. Sólo así pudo ser condenado el acusado de acuerdo con los hechos y la ley.

*En tal virtud, debe revocarse la sentencia recurrida concediéndose la celebración de un nuevo juicio.*