El Pueblo de Puerto Rico, demandante y apelado, v. Noemí Rodríguez de Escobar, acusada y apelante.

Núm. 11264.—*Sometido:* Abril 5, 1946. *Resuelto:* Junio 21, 1946.

318

*R. Rivera Zayas,* abogado de la apelante; *Hon. Procurador General E. Campos Del Toro, Luis Negrón Fernández, Primer Procurador General Auxiliar,* y *J. Correa Suárez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

La apelante fué sentenciada por un delito de abuso de confianza (*felony*), consistente en haberse apropiado la cantidad de $3,200 pertenecientes a Dolores Cabanillas, que le fué entregada por ésta para que le comprara billetes de la lotería.

Se queja la apelante de que el veredicto es contrario a derecho y a la prueba y que consecuentemente la sentencia es errónea. La evidencia es contradictoria. La del fiscal tiende a demostrar que la perjudicada conoció a la apelante en el mes de mayo de 1944 y desde entonces se inició cierto negocio entre ellas, en relación con la compra y venta de billetes de la lotería. La apelante, al principio, le traía semanalmente de 20 a 40 billetes que compraba en distintas agencias de la Lotería a $5.20 y $5.30, y se los vendía a $5.40, y algún tiempo después a razón de $5.50 por billete. La perjudicada a su vez los vendía a los billeteros a razón de $5.80 y éstos los revendían a $6.00 cada uno. De esta suerte, la apelante tenía un beneficio de 10 centavos ó 20 centavos por billete y la perjudicada de 20 centavos. Al principio la perjudicada pagaba el importe de los billetes al entregárselos la apelante, pero el negocio fué gradualmente aumentando, habiendo alcanzado hasta 200 los billetes que semanalmente le compraba la perjudicada, y entonces la apelante le indicó que no tenía suficientes fondos y le pidió que le diera el dinero para ella comprarlos. Las relaciones de negocio que hasta ese momento habían existido entre ellas còntribuyeron

a que la perjudicada depositara cierta confianza en la apelante por lo que aquélla no tuvo inconveniente en entregarle por adelantado, previo recibo, el precio de los billetes que debía comprarle. El negocio continuó normalmente hasta que en la mañana del 12 de agosto de 1944 llegó la apelante a la casa de la perjudicada y so pretexto de que tenía mucha prisa porque viajaba en un *taxi,* logró que ésta le entregase la cantidad de $3,200 para comprarle billetes, prometiendo que dentro de pocos momentos le firmaría el recibo. Temerosa la perjudicada de que la apelante pudiera resentirse si en tales circunstancias le exigía inmediatamente el recibo, le entregó el dinero en presencia de su hermana y de Gabriel Rodríguez, un vendedor de billetes. Los billetes debía entregárselos la acusada el 21 de agosto, pues correspondían al sorteo del 23 y necesitaba dos días para que los billeteros pudiesen venderlos. La apelante no firmó el recibo. El lunes 14 de agosto la perjudicada la llamó por teléfono y su marido le contestó que ella se hallaba en la Isla comprándole los billetes. El martes volvió a llamarla y el marido le dijo que tuviese calma que ella estaba en la Isla comprando los billetes. Dos o tres horas después de la segunda llamada, volvió la perjudicada a llamar al colmado y el marido le dijo: "Ahora mismo recibí una llamada telefónica donde me decía que ya mismo salía con los billetes." Más tarde, aquel mismo día, la sirvienta de la perjudicada vino a avisarle que el colmado de la apelante había sido embargado. Inmediatamente la perjudicada fué al colmado, pero no encontró a la apelante. Fué entonces la perjudicada a Caguas a la casa de don Antonio Longo, acompañada de su hermana, de su padre y de don Roberto H. Todd (padre), y encontró a la apelante sentada en la terraza junto a su marido. La apelante le dijo que tuviera calma que su dinero estaba seguro, pero la perjudicada insistió en que se lo pagara inmediatamente. La apelante le repitió que estuviera tranquila y al insistir la pérjudicada en la devolución de su dinero, aquélla

la llamó aparte y cogió una llave diciéndole: "Véngase que le voy a dar su dinero". En ese momento llamó a su marido y hablaron entre ellos (la apelante y el marido) y entonces dijo la apelante a la perjudicada: "Véngase mañana a las ocho, que le tengo su dinero". Al día siguiente, cuando la perjudicada iba para Caguas, se cruzó en el camino con la apelante. La perjudicada la llamó y la apelante le ofreció firmarle un pagaré por $10,000, proposición que fué rechazada, indicándole que ella no le debía esa cantidad. La apelante le ofreció entonces una garantía para que estuviese tranquila. Fueron a la oficina del Lic. Benicio Sánchez, abogado de la perjudicada, y allí admitió la apelante que había recibido el dinero para comprarle los billetes y propuso la garantía de don Antonio Longo, la cual fué aceptada inmediatamente. El abogado le dió todo el día para que trajese la fianza, pero cuando salía la apelante, volvió atrás y preguntó al abogado si no preferiría el pago. Aceptada su proposición, quedó en pagar a la 1:30 de aquel día, pero la perjudicada no volvió a verla hasta el día del juicio.

Para probar la intención de defraudar, el fiscal, con la oposición de la acusada, presentó evidencia de otras transacciones de la apelante relacionadas con compra de billetes coetáneas con la envuelta en este caso. Entre éstas hay una relacionada con la perjudicada, objeto de otra acusación, que inmediatamente vamos a exponer:

El viernes 11 de agosto de 1944 la apelante vino a la casa de la perjudicada y le dijo que un empleado suyo, a quien llamaban Nino y cuyo nombre es Benigno Santiago, le había dicho que en Yauco podían conseguirse 136 billetes del sorteo del día 16 de agosto, que ella no tenía dinero para comprarlos y los ofreció a la perjudicada. Esta le contestó que quería ver a Nino y fué al colmado de la apelante. La apelante preguntó a Nino si era verdad que tenía los 136 billetes en Yauco. Nino parecía remiso a contestar y la per-

judicada no quiso dar el dinero sin una garantía, pero la apelante le dijo que parecía que la perjudicada no tenía confianza en ella, y entonces la perjudicada preparó un recibo que la apelante firmó y recibió la cantidad de $748, la cual entregó a Nino diciéndole: "Vete a Yauco a buscar los billetes inmediatamente." Se convino en que al día siguiente Nino estaría de regreso con los billetes. Pero el sábado, como a las diez de la mañana, la apelante mostró a la perjudicada un telegrama que le había enviado Nino desde Yauco, informándole que no había conseguido los billetes para el sorteo del 16, que todos correspondían al sorteo del 23 y los llevaría el día 15. Ni los billetes ni el dinero fueron jamás recibidos por la perjudicada y como el martes 15 fué el embargo del colmado, la perjudicada empezó sus gestiones para recobrar las dos cantidades, es decir los $748 y los $3,200 que había entregado a la apelante.

Benigno Santiago declaró como testigo del fiscal que fué empleado de la apelante; que hacía como mes y medio había dejado la colocación y vivía en Yauco; que el día 10 de agosto vino a Santurce a ver a su hermana y el 11 fué donde la apelante, quien le dijo que no se fuera, que ella necesitaba $748 y se los iba a pedir a la perjudicada y para conseguir el dinero le diría que él tenía unos billetes en Yauco. Nino le contestó que él no tenía tales billetes y la apelante le dijo que ella los entregaría a la perjudicada al día siguiente. Cuando vino ésta se firmó el recibo antes mencionado y la apelante recibió el dinero, pasándolo a Nino en presencia de la perjudicada, pero después de irse ésta, la apelante le dijo que le entregase el dinero y él se lo entregó. Redactó ella el telegrama en cuestión y se lo entregó con 50 centavos para que lo enviase desde Yauco el sábado 12. A ese mismo efecto el fiscal presentó el testimonio de dos personas más a quienes la apelante había tomado dinero para compra de billetes y se lo había apropiado.

Llamados por el fiscal, declararon también don Roberto H. Todd (padre), y el Lic. Benicio Sánchez, corroborando a la perjudicada.

La apelante negó que hubiese recibido los $3,200 en cuestión. En lo que respecta a la transacción con Nino negó toda responsabilidad declarando que ella se constituyó en fiadora y que el negocio se celebró entre él y la perjudicada, sin que la apelante participara del dinero. Negó asimismo haber redactado el telegrama y trató de explicar las transacciones de negocios con las otras personas que alegaban haber sido defraudadas por ella. Describiendo sus relaciones de negocios con la perjudicada, declaró:

"Esa relación es que ella y yo entablamos un negocio de comprar billetes de la Lotería y ella dándome a mi dinero y yo comprar los billetes a cierto precio y ella se los daba a otro precio a sus billeteros y de esos beneficios yo ganaba una cantidad y ella ganaba otra cantidad y para eso siempre teníamos, que el padre de ella nos había preparado, una libreta de la compra y venta de billetes y el dinero que se entregaba y después se partían los beneficios e interés de los negocios y vino una relación amplia hasta esos días que eso sucedió."

Negó que don Roberto H. Todd hubiera estado presente en la conferencia que ella celebró con la perjudicada en la casa de don Antonio Longo y refiriéndose a esta entrevista dijo, en síntesis, que no fué cierto que ella ofreciera a la perjudicada pagarle dinero alguno en aquella ocasión. Admitió que a instancias de la perjudicada, al día siguiente de la conferencia en la casa de don Antonio Longo, la acompañó a la oficina del Lic. Benicio Sánchez, pero que no es cierto que ella admitiera en presencia de éste que había recibido la cantidad de $3,200; que ella aceptó que le debía los $1,077 que tenía en su poder,(1) más los $748 entregados a Nino.

--------

(1)Refiriéndose a la cantidad de $1,077 que dijo siempre tenía en su poder perteneciente a la perjudicada, declaró que esa cantidad la dedicaba a comprar billetes "de otra categoría", y que como la perjudicada había tomado esa cantidad a préstamo y tenía que pagar intereses, la acusada le pagaba $70 semanales para hacer frente a esos intereses. A ese efecto presentó en evidencia

de los cuales ella se había constituído en garantizadora, o sea en total $1,825; que el abogado le indicó que garantizara dicha suma, pero ella le contestó que habiéndole sido embargado el colmado, no encontraría quién la garantizase; que creía innecesaria tal fianza porque ellas habían estado en negocios y hasta entonces no se le había exigido garantías; que en ningún momento ofreció la de don Antonio Longo ni propuso que si no la conseguía le traería el dinero.

En el examen de repregunta la apelante admitió que no era casada con Escobar y que el colmado que decía pertenecer a ella y a su marido, estaba a nombre de su cuñada Francisca Laureano Escobar, la cual no sabía leer ni escribir y hacía más de un año que residía en Nueva York. Por último, presentó cierta evidencia documental tendiente a probar que las otras personas que alegaban haber sido defraudadas fueron posteriormente indemnizadas por ella.

Tal fué la evidencia que tuvo ante sí el jurado. Es contradictoria en ciertos extremos, pero es indudable que la conclusión del jurado encuentra apoyo en la evidencia y siendo ello así no podemos convenir con la apelante en que el veredicto es contrario a derecho y a la prueba.

■ En un juicio criminal no puede admitirse evidencia de otro delito distinto del que se imputa en la acusación. Pero esa regla tiene una excepción tan firmemente establecida como la regla misma. Bajo esa excepción, evidencia de transacciones similares coetáneas con los hechos del delito imputado en la acusación, es admisible para probar un plan preconcebido o la intención de defraudar. *Pueblo* v. *Pérez*, 47 D.P.R. 765; *Thorp* v. *People,* 129 P.2d 296; *Bacino* v. *People,* 90 P.2d 5; 2 Wigmore, *Evidence* (3ra. Ed., 1940), sección 304, pág. 202. Por lo tanto, no erró la corte al ad-

una libreta que contenía varios recibos de pagos hechos a la perjudicada y entre ellos uno suscrito y firmado por ésta que decía así: ''Recibí de Doña Noemí R. de Escobar la cantidad de quinientos billetes del sorteo del día 16 de agosto, sorteo ordinario número 295, quedando en su poder la suma de $1,825.00 dólares, por lo cual recibo setenta dólares semanales. (fdo.) Lolín Cabanillas.''

mitir evidencia de las transacciones en que estuvieron envueltos Benigno Santiago y los testigos Camacho y Cordero que declararon haber sido perjudicados, no impidiendo su admisión el hecho de que el delito envuelto en la transacción con Benigno Santiago fuese de falsa representación y que las de los otros dos testigos fuesen de carácter puramente civil. *People* v. *Robinson*, 290 P. 470.

■ Se queja la apelante de que la corte inferior admitió en evidencia la declaración del abogado Benicio Sánchez e invoca el art. 402 del Código de Enjuiciamiento Civil, alegando que la manifestación que ella hiciera al abogado eran comunicaciones privilegiadas sobre las cuales él no podía declarar sin su consentimiento. Ya hemos expuesto cómo tuvo lugar la entrevista con el abogado Benicio Sánchez, resultando que la apelante no era su cliente y por consiguiente las manifestaciones que ella le hiciera no son privilegiadas. *Piercy* v. *Piercy*, 124 P. 561.

■ La apelante se queja de las instrucciones de la corte. Alega que no trasmitió la ley correctamente al jurado, que nada se dijo en ellas acerca de la relación fiduciaria, elemento esencial del delito de abuso de confianza; que a lo sumo las instrucciones son contradictorias, y por tanto, necesariamente tuvieron que confundir al jurado. Por último, que erró la corte inferior al no trasmitir tres de las cuatro instrucciones especiales solicitadas por la defensa.

Al referirse el juez al delito imputado a la acusada, empezó con la definición del delito, según consta del art. 445 del Código Penal, diciendo: "Se comete el delito de abuso de confianza cuando una persona se apropia fraudulentamente de bienes, de dinero, que le haya sido confiado." Es verdad que más adelante les instruyó en el sentido de que si el convenio entre la acusada y la Srta. Cabanillas fué al efecto de que el dinero recibido por la primera había de utilizarse única y exclusivamente para la compra de billetes de la lotería y no para otros fines, que si de acuerdo con ese

contrato la acusada no podía utilizar ese dinero para su propio beneficio, sino para la compra de billetes, en ese caso, si el jurado llegaba a la conclusión más allá de duda razonable que ella se apropió fraudulentamente del dinero, entonces el delito cometido era el de abuso de confianza. Pero inmediatamente sigue instruyéndoles: "Si por el contrario el jurado cree . . . que el contrato entre las partes fué a virtud del cual.la Srta. Cabanillas le entregó dinero a ella con el propósito de que ella podía utilizar el dinero para lo que ella desease, que no estaba obligada a virtud del entendido o del contrato a comprar billetes sino que ella podía utilizarlos para lo que ella desease, en otras palabras, que la relación entre ella y la Srta. Cabanillas fué única y exclusivamente de prestamista y prestataria, o sea que inmediatamente que ella recibió el dinero vino a ser única y exclusivamente una prestataria que podía utilizarlo en lo que ella quisiese, con la única obligación de devolver ese dinero a la Srta. Cabanillas o sea que entre ellas no había más relación que la de simplemente acreedor y deudor, un préstamo, entonces no hay tal abuso de confianza."

Concedemos que la primera parte de está instrucción no es todo lo clara que debió ser, pues es compatible con la hipótesis de que la acusada recibiese el dinero en calidad de préstamo bajo la condición de que lo invertiría exclusivamente en la compra de billetes de la lotería. Tampoco es clara la segunda parte, pues tiende a condicionar la relación de prestamista y prestataria a que de acuerdo con el contrato ésta no viniese obligada a invertir el dinero en billetes de la lotería. Pudo haberse convenido entre las partes que el importe del préstamo se invirtiera por la prestataria en billetes de la lotería. Ese pacto no quitaba a la transacción el carácter de préstamo y el incumplimiento de tal obligación personal no constituiría delito alguno. Pero la suficiencia de las instrucciones debe ser considerada teniendo en cuenta las instrucciones en su totalidad, de suerte que la

obscuridad o ambigüedad de una parte pueda ser aclarada por las demás. Y si seguimos examinando las instrucciones, veremos que al finalizar la discusión sobre el delito de abuso de confianza, dijo la corte:

"En síntesis, señores del jurado, si ustedes creen de la prueba practicada en este caso y lo creen más allá de duda razonable que la Srta. Dolores Cabanillas confió a la acusada en este caso $3,200, o parte de esa suma siempre y cuando que esa suma fuese mayor de $100, y que la Srta. Cabanillas confió esa cantidad de dinero a la acusada con el único propósito de que le comprase billetes de lotería y nada más que con ese propósito, y creen más allá de duda razonable de la misma prueba practicada en este caso que de acuerdo con el convenio y de la transacción celebrada entre la Srta. Cabanillas y la acusada, la acusada no tenía derecho a utilizar esos fondos nada más que con el propósito de comprar billetes de lotería, y creen entonces también de la prueba practicada y más allá de duda razonable que ella violó el compromiso contraído a sabiendas de que ejecutaba un acto que le estaba prohibido a virtud del mandato que se le había conferido, si ustedes creen eso y creen entonces que ella violó ese mandato, se apropió de ese dinero y se apropió de ese dinero fraudulentamente con la intención de defraudar a la Srta. Cabanillas, es vuestra obligación declarar a la acusada culpable del delito de abuso de confianza.

"Si los señores del jurado creen de la prueba practicada en este caso que el convenio o contrato celebrado entre la Srta. Cabanillas y la acusada fué uno de préstamo, fué uno a virtud del cual la acusada vino a ser dueña del dinero que la Srta. Cabanillas le entregara y que ella podía apropiarse de ese dinero y utilizarlo en su beneficio y que las relaciones habidas entre la acusada y la Srta. Cabanillas era una de prestamista y prestataria, o si tienen duda alguna sobre esos hechos o de que falta alguno de los elementos que integran el delito de abuso de confianza, según la corte les ha explicado a ustedes, es la obligación vuestra declarar a la acusada no culpable.''

A nuestro juicio, la instrucción que acabamos de transcribir, disipó cualquier duda que la imprecisión de las anteriormente mencionadas pudieron haber producido en el jurado.

En lo que respecta a las tres instrucciones especiales que denegó la corte, la primera y la segunda estaban sustancial-

mente comprendidas en las instrucciones generales. En lo que a la tercera respecta, no tenía apoyo en la evidencia, pues la acusada negó que ella hubiera recibido la cantidad de $3,200 y en ningún momento presentó evidencia para probar que no devolvió dicha cantidad o cualquier parte de la misma, "por causas desgraciadas que no tenían carácter criminal". No erró, pues, la corte, al negarse a trasmitirla.

█ Bajo el sexto señalamiento de error se queja la apelante de las instrucciones respecto a las otras transacciones presentadas en evidencia con el fin de probar la intención de defraudar. La apelante se refiere solamente a una parte de las instrucciones sobre esa materia. Vamos a transcribir la instrucción en su totalidad.

"En este caso, señores del jurado, se ha presentado prueba, y la corte la admitió, sobre otras transacciones de naturaleza similar realizadas por la acusada tendente a probar que la acusada hizo transacciones de naturaleza similar a las envueltas en este caso. En primer término, me estoy refiriendo a los testimonios de Camacho y de Juan Deogracia, ustedes tienen que determinar si en realidad de verdad hubo o no hubo esas transacciones. Si las hubo, si llegan a la conclusión de que las hubo y llegan a esa conclusión más allá de duda razonable, la Corte les instruye a ustedes entonces que ustedes no pueden tomar en cuenta el que la acusada haya hecho esas transacciones con el propósito de condenarla a ella, por haber realizado esas transacciones, del delito que ahora se le acusa a ella. El hecho que ella haya celebrado, si llegan a esa conclusión más allá de duda razonable, una transacción similar, y llegan a la conclusión también más allá de duda razonable que lo hizo así también con el propósito de defraudar, esa transacción no puede ser utilizada por ustedes con el propósito de condenar a la acusada por este delito por el hecho de que ella haya realizado aquellas transacciones. Pero sí pueden ustedes, señores del jurado, para determinar si en este caso específico que estamos investigando en el día de hoy, ustedes pueden, si llegan a la conclusión de que la acusada realizó esas otras transacciones de que se ha hablado y que en esas transacciones medió también entre ella y Camacho y Deogracia relaciones de principal y agente y de que en esas transacciones ella tuvo la intención de defraudar a Camacho y a Deogracia, y creen eso más allá de duda

razonable, entonces pueden ustedes utilizar esa prueba con el propósito de determinar si en este caso existió o no existió el estado mental, la intención específica de defraudar. Ustedes pueden utilizar esas transacciones con el propósito de determinar junto con la prueba practicada en este caso, junto con las declaraciones de Benigno Santiago, del Lcdo. Benicio Sánchez Castaño y del Sr. Todd y de las demás personas que han declarado en este caso si en conjunto hubo o no hubo en este caso la intención específica de defraudar."

La mera transcripción de la instrucción en su totalidad, basta para demostrar su corrección. *Pueblo* v. *Pérez,* supra; *Thorp* v. *People,* supra; *Bacino* v. *People,* supra; *People* v. *Robinson,* supra; Wigmore, *Evidence,* ob. y t. cit.

■ Tratando de identificar cierto documento, la defensa preguntó a la acusada: "Este documento, ¿qué es?" Se opuso el fiscal y antes de que la corte resolviese la oposición contestó la acusada: "Ese documento es una constancia de un negocio establecido por la Srta. Lolín Cabanillas y yo como contrato de billetes de la lotería." Pidió el fiscal la eliminación de la respuesta de la acusada y resolvió el juez:

"Cualesquiera que fuesen las relaciones entre la testigo y la Srta. Cabanillas, cualesquiera que fuesen, es un contrato. Pudiera ser un contrato de depósito, de préstamo, un contrato de mandato, pero sean cuales fueren, ahí existía un contrato. La Defensa dirá que la naturaleza del contrato ese era un contrato de préstamo y el Fiscal dirá que era un contrato de depósito o de mandato, pero sea como fuese es un contrato, pero no le quita responsabilidad criminal si hay todos los elementos del delito de abuso de confianza.".

Manifestó entonces la defensa:

"Todo eso son opiniones de la corte. Hay contratos entre deudores y acreedores y no puede haber delito de abuso de confianza."

Dictó entonces la corte la siguiente instrucción al jurado:

"La Corte les instruye ahora en este caso que la ley en este caso vendrá de labios de la Corte y que la ley es lo que la Corte diga y si la Corte se equivoca, caso de una convicción, será a un tribunal superior a quien competa decir si la Corte estaba equivocada. Las

manifestaciones del abogado no pueden tomarlas como que constituyen una expresión de la ley sino que la ley es lo que la Corte les diga. La Corte les instruirá a ustedes que pueden existir relaciones de acreedor y deudor y les instruirá ampliamente sobre eso. Si es un contrato de préstamo no hay abuso de confianza porque el dinero pertenece al prestatario y puede hacer con él lo que él guste, pero puede existir un contrato de mandato y de depósito y en tal caso el mandatario o el depositario no tiene autoridad alguna para apropiarse de ese dinero. Si se apropia fraudulentamente de ese dinero entonces comete el delito de abuso de confianza y esa es la ley y sobre eso la Corte les instruirá más detalladamente cuando llegue su oportunidad."

No vemos que la corte hubiese cometido error alguno al hacer las manifestaciones que hizo resolviendo la moción del Fiscal para que se eliminase la contestación de la acusada explicando la naturaleza del documento, especialmente si se toma en cuenta la instrucción arriba transcrita que en relación con el incidente, trasmitió inmediatamente al jurado.

■ Se queja la apelante de que al terminar la declaración del testigo de cargo Benigno Santiago solicitó que se eliminara la declaración en su totalidad y que se instruyese al jurado que no debían considerarla en relación con este caso y que el juez, al declarar sin lugar su moción, dijo:

"Uno de los elementos del delito de abuso de confianza y que el Fiscal tiene que probar es la intención de defraudar y es fundamental que en una acusación de abuso de confianza puede presentarse en evidencia otros delitos de abuso de confianza cometidos por la misma acusada con el objeto de demostrar la intención fraudulenta y este testigo declaró que la acusada le hizo poner un telegrama desde Yauco en relación con los $748, telegrama que hasta cierto punto envolvía una transacción ficticia sobre unos billetes de lotería que él no tenía y que fué simplemente un entendido entre ella y él en que el telegrama se pusiera y eso tiende a demostrar que el propósito de la acusada era defraudar a esta Srta. Cabanillas. Si esa prueba es creída por el jurado, de ella puede el jurado deducir que había el propósito de defraudar no solamente $748 sino los $3,200. La corte niega la eliminación."

Como podrá verse por la instrucción que acabamos de transcribir, la corte no aseguró que fuese cierta la declaración de Benigno Santiago a que se refiere la resolución impugnada. Todo lo que hizo fué sintetizar la declaración de dicho testigo, de la cual resulta que el telegrama era falso. Tuvo buen cuidado el juez de decir al jurado: *"Si esa prueba es creída* puede el jurado deducir que había el propósito de defraudar no solamente $748 sino los $3,200."

Solicitó la defensa la reconsideración y al denegarla la corte hizo constar que específicamente informaría al jurado el propósito único por el cual podía considerarse esta transacción de los $748, y así lo hizo.

No cometió la corte el error imputado.

 Alega la apelante que erró la corte *a quo* al permitir que se le repreguntase sobre las transacciones de ella con otras personas tendientes a probar la intención de defraudar, no habiendo sido ella examinada sobre ese extremo en el interrogatorio directo.

El acusado no está obligado a declarar. La Ley le concede el privilegio de no incriminarse. Empero, si opta por declarar, se le interrogará, naturalmente, sobre cuestiones pertinentes y su contestación podría incriminarlo. De este principio ha surgido la regla al efecto de que desde el momento en que el acusado opta por declarar, renuncia al privilegio de no incriminarse y queda obligado a contestar cualquier pregunta pertinente que pudiera hacérsele, a pesar de que la materia sobre la cual se le interrogue no haya sido objeto del examen directo, excepto cuando el contrainterrogatorio tenga por objeto impugnar su veracidad como testigo. 8 Wigmore, *Evidence* (3ra. Ed. 1940) sección 2276, pág. 440; *Cf. Pueblo* v. *Román,* 18 D.P.R. 219, 232.

 El undécimo señalamiento de error no merece seria consideración. Bastará reproducir aquí el incidente:

"Sr. Fiscal: ¿Usted alguna vez no ha conocido alguna persona que se paró con usted al frente de los solares al lado de 'El Mundo'

y cerca de donde estaba el Federal Land Bank y usted le ha dicho: usted puede prestarme esos $1,500 porque esos solares son míos y ahí voy a hacer un edificio de 10 pisos?

"Defensa: Objeción.

"Sr. Fiscal: El ha presentado a su testigo como una persona inocente y yo estoy investigando la credibilidad de la acusada.

"Defensa: Yo no me puedo oponer a que el Fiscal trate de impugnar mis testigos. Eso es una pregunta fantástica y yo me opongo."

Después de la oposición de la defensa el fiscal no insistió y varió el tema de su repregunta. No vemos qué perjuicio pudo causarse a la acusada con esa pregunta, que su abogado, muy acertadamente, calificó de fantástica.

▬▬ La apelante señala como error el haber la corte denegado su moción para que el Fiscal, con vista del sumario en el caso relacionado con la apropiación de los $748, declarase como testigo de la defensa si en dicho caso se habían expedido dos órdenes de arresto, una contra Benigno Santiago que fué dejada sin efecto y la otra de fecha posterior contra la acusada. El propósito de esa prueba, según anunció la defensa, era impugnar la veracidad de Benigno Santiago y Lolín Cabanillas, quienes durante el juicio habían declarado que contra Benigno Santiago no se había expedido orden de arresto en el caso relacionado con los $748. Si se habían expedido o no las dos órdenes de arresto en el referido caso, era una cuestión colateral a aquél por el cual se juzgaba a la acusada. En cuanto a Lolín Cabanillas, no fué errónea la resolución sencillamente porque para atacar la veracidad de un testigo no es admisible evidencia que tienda a contradecirlo en relación con una cuestión colateral. 3 Wigmore, *Evidence*, (3ra. Ed. 1940) sección 1020, pág. 692 *et seq.* Sin embargo, en lo que a Benigno Santiago respecta, las circunstancias concurrentes son distintas. La evidencia ofrecida tendía a probar que contra él se había librado una orden de arresto como presunto autor del delito relacionado con los $748 y que esa orden de arresto fué luego dejada sin

efecto, librándose posteriormente otra contra la apelante. El efecto de esa evidencia era demostrar cierto interés por parte de Benigno Santiago al declarar en contra de la acusada, exonerándose él de dicho delito y dejando recaer toda la responsabilidad sobre ella. Demostrado ese interés por parte del testigo, para lo cual la prueba de su arresto era admisible, 3 Wigmore, *Evidence* (3ra. Ed. 1940) sección 1022, pág. 697, quedaba atacada su veracidad. Consecuentemente erró la corte inferior al no admitir la evidencia ofrecida en lo que a este testigo concierne. Pero Benigno Santiago declaró en el juicio con lujo de detalles, cómo él contribuyó al engaño de que fué víctima Lolín Cabanillas recibiendo de ella para la acusada los $748, para la supuesta compra de billetes en Yauco y enviando desde allí un telegrama falso, sabiendo que todo era un ardid de la acusada para obtener dicha cantidad. Además, el mismo testigo declaró que con motivo del caso de los $748 estuvo detenido en el Cuartel de la Policía toda una noche y parte de un día. Siendo ello así, la prueba ofrecida por la defensa no hubiera llevado al jurado más información sobre el interés o prejuicio que pudiera tener el testigo, que lo que ya el jurado sabía por la propia declaración de Benigno Santiago. En tales circunstancias, el error no perjudicó los derechos sustanciales de la acusada y consecuentemente no causa la revocación de la sentencia.

Arguye la apelante que erró la corte inferior al permitir al fiscal, con la oposición de la defensa, presentar en el turno de refutación, los testigos Maximino Camacho y Juan Deogracias Cordero y un documento que debió presentar en su prueba directa.

Concedemos que la evidencia en controversia no tenía el carácter de prueba de refutación, pero el orden de la prueba descansa en la sana discreción de la corte sentenciadora, y a menos que se demuestre perjuicio, el tribunal de apelación no interviene con el ejercicio de esa discreción. En el pre-

sente caso la defensa tuvo oportunidad de repreguntar dichos testigos, y en efecto les preguntó extensamente. Fué más lejos aún y, tratando de refutar sus testimonios, llamó como testigo al abogado Coballes Gandía. En tales circunstancias carece de mérito este señalamiento de error.

El décimoquinto error se refiere a la resolución de la corte sentenciadora denegando la moción de nuevo juicio. Esta moción se basó en los catorce errores ya discutidos y habiendo concluído que no existieron, procede declarar que actuó la corte correctamente al denegar la moción de nuevo juicio.

*Procede la confirmación de la sentencia.*

El Juez Asociado Sr. Todd, Jr., se inhibió.